RICHARD CARNEY, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 7027.   Promulgated March 10, 1927.

The fair market value of petitioner's land on March 1, 1913, was $18,500.

*Douglas D. Felix, Esq.,* for the petitioner.
*A. R. Marrs, Esq.,* for the respondent.

Proceeding for the redetermination of a deficiency in income tax for the calendar year 1919, determined by the Commissioner in the amount of $6,587.85.

### FINDINGS OF FACT.

Petitioner is a resident of Cocoanut Grove, Fla. Prior to the year 1913 he acquired a parcel of land on Miami Beach, in Florida, of 14.5 acres. He conveyed 1.3 acres of this property to another at a time immaterial to this proceeding, and in the year 1919 he sold the remaining 13.2 acres for $45,000. In returning his income for taxation for the year 1919, the petitioner reported a fair market value on March 1, 1913, of the land sold of $40,000. The Commissioner determined the value on the basic date to be $4,200 and restored the difference to income and, accordingly, determined the deficiency here in controversy.

The property in question is a strip of land 200 feet wide fronting on the Atlantic Ocean. It runs back westward between parallel lines for a distance of approximately 3,000 feet. About the basic date it was bounded as follows: On the east by the Atlantic Ocean, on the

north by the lands of Carl Fisher and Collins (later the Alton Beach Realty Co.) and on the south and west by the lands of Ocean Beach Realty Co. It is situated about one and one-fourth miles north of Biscayne Avenue and the fee to the land included the riparian rights on the ocean frontage. About one-third of the east end of the land was on a ridge and was generally higher than the surrounding lands, approximately the middle third was somewhat lower, while the west third was lower still, though not lower than the contiguous lands. A portion of this western third was what is known as palmetto swamp or sand dunes. It was not mangrove swamp. The property to the west, southwest and northwest was mangrove swamp and required filling in to make it useful, at a cost of $2,000 to $2,500 per acre on the average. The east third of petitioner's land needed no filling but, about the basic date, the lands surrounding petitioner's property on the west, southwest and northwest were filled in to a level higher than the west third and a greater portion of the middle third of petitioner's property. This filling necessitated the filling of that portion of petitioner's land. The west third was filled by approximately 2 to 2½ feet—diminishing as the filling proceeded eastward, while the middle third was filled to a depth varying from 1½ feet to 6 inches. The reasonable cost of the amount of filling indicated on petitioner's tract was $5,500.

At the basic date there was no settlement of the Miami Beach section to speak of. Collins Avenue (now Washington Boulevard) was a road but it had not been developed as such. The only practicable means of transportation between this property and the south end of the island was a boardwalk which ran from Hardie's Casino along the ocean front to petitioner's property. There were only four structures south of Collins' residence, which was a mile north of petitioner's land. Two of these structures were bathing and amusement casinos on the extreme south beach, one was the home of J. C. Gramling, the other was the home of A. J. Bendle, then under construction. There were no waterworks, schools, electric lights, telephones or other conveniences of urban life. The only means of communication with the mainland was by ferryboat across Biscayne Bay. This ferry line ran to the south end of the beach. The Collins bridge had been partially completed. It was finally completed in June, 1913. The Causeway had not yet been begun.

Some time in 1912, or prior thereto, Collins had begun a development of his properties adjoining petitioner's to the northward. As a means to this end he began the construction of a wooden bridge across Biscayne Bay from the mainland to that portion of the island now known as North Beach, in which petitioner's property lay. Collins was unable to carry out his undertaking for lack of funds.

In 1912 he interested Carl Fisher in the project. Fisher was a man of large wealth. Having become interested in the general development in that vicinity, Fisher announced and it became generally known that he would carry out such development on a large scale. Fisher took over the Collins bridge and pushed it to completion in June, 1913. The cost of this work to Fisher was $40,000, and Collins conveyed to Fisher about 200 acres of land as reimbursement or part reimbursement for such expenditure. This was about 1912.

Prior to the time Fisher came on the scene the principal values in real estate were to be found in the extreme south end of the island. Values were higher there than in the vicinity of petitioner's tract. The coming of Fisher materially changed this situation and values increased rapidly in petitioner's vicinity. Due to Fisher's influence, activity in real estate development began to be apparent early in 1913. About March 1, 1913, the Ocean Beach Realty Co. purchased a tract of 500 acres adjoining petitioner on the south and running to the southward and southwestward. The purchase price was $85,000. Of this 500 acres, approximately 75 per cent was swamp land which had to be reclaimed by filling before it was fit for use. The remaining 25 per cent was ridge land along the ocean front.

The Ocean Beach Realty Co. immediately subdivided its property and placed it on the market. The lots began to sell early in 1913 along Collins Avenue from Fifth Street to Twentieth Street. About 20 of such lots were sold at about that time. The corner lots sold for $800 each, while inside lots sold for $500 each. The lots so sold were on the portion of the company's land which did not require any filling. These lots averaged 50 feet frontage and 150 feet depth. The company offered to give lots to persons who would build residences thereon. Seven or eight persons availed themselves of this offer early in 1913 and lots were given to them about midway between Fifth and Fifteenth Streets. On March 8, 1913, lots of similar size on corners and ocean frontage on South Beach sold for $1,000 each, while inside lots sold for about $850 each.

In the latter part of 1912 and throughout 1913 Fisher and Collins owned the land adjoining petitioner on the north. Early in 1914 they sold this land to the Alton Beach Realty Co. for a consideration of $546,000. This purchase contemplated approximately 400 acres, or $1,365 per acre. This was the average price for the whole tract including both high land and swamp land. A less percentage of this land was swamp than of that purchased by the Ocean Beach Realty Co. This company did not subdivide and offer lots for sale in this tract until after the basic date.

The cost of filling in the petitioner's tract on the western two-thirds at March 1, 1913, in order to bring it to a marketable level,

was $5,500. The fair market value of the land in question was $18,500 on March 1, 1913.

OPINION.

KORNER, *Chairman:* Various witnesses gave testimony tending to prove the fair market value of the petitioner's land on March 1, 1913. The opinion evidence was weakened by the fact that the witnesses were not able to show a very high degree of qualification as expert witnesses. Other witnesses did not offer opinions but testified to sales in the immediate vicinity of similarly situated lands and also to sales of more or less similarly circumstanced property more distantly removed from the immediate vicinity. We have considered all the evidence and weighed it in the light of the varying circumstances applicable to each transaction given as a basis. Each portion of the evidence has been considered in the light of, and in relation to, the other portions of the evidence. We are convinced that considerable activity in the land market on Miami Beach had evidenced itself in the early months of the year 1913 and that market values were substantial in spite of the yet undeveloped terrain. On the other hand, we are not convinced that the land had the high value claimed for it at the hearing by the petitioner of $42,000, or approximately $3,200 per acre. Even on a basis of subdivided lots at the price they were bringing a year or two later, the sum total would not approach such a figure. Taking into consideration all the evidence and all the factors entering into the transactions, we are convinced that the fair market value on March 1, 1913, was approximately $18,500, and we find that to be the value on that date.

> *Judgment will be entered after 15 days' notice, under Rule 50.*